Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SALEHA ABDULLAH

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALEHA ABDULLAH, on behalf of herself and all similarly situated persons,<br><br>     Plaintiff,<br><br>v.<br><br>STITCH FIX, INC., a Delaware Corporation,<br><br>     Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br> **1) CAL. PENAL CODE § 638.51** |

1

Plaintiff SALEHA ABDULLAH ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant STITCH FIX, INC., a Delaware Corporation ("Defendant" or "STITCHFIX"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.stitchfix.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol (IP) addresses, session data, clickstream activity, and form inputs in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

5.    When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.    When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics, Tag Manager, Ads, DoubleClick)
- Facebook Tracker
- Criteo Tracker
- Tapad Tracker

7.    The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.    The Trackers are operated by distinct third parties, including Google LLC (as to Google Analytics, Google Tag Manager, and Google Ads/DoubleClick), Meta Platforms, Inc. (as to the Facebook Tracker), Criteo S.A. (as to the Criteo Tracker), and Tapad, Inc. (as to the Tapad Tracker) (collectively, the "Third Parties"). Defendant knowingly enables and deploys these Trackers on the Website and causes them to execute automatically within users' browsers during ordinary page loads. Through this configuration, Defendant causes users' browsers to transmit electronic communication metadata, including full page URLs, referrer paths, persistent third-party identifiers, device and browser characteristics, and other routing, addressing, and signaling information, to servers controlled by the Third Parties. These transmissions occur for purposes including analytics and behavioral measurement (Google), advertising attribution and targeting (Google and Meta), retargeting and cross-partner identifier synchronization (Criteo), and cross-device identity resolution and data brokerage

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

(Tapad). The Tapad Tracker is operated by a registered California data broker. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's design and configuration choices and are not required to render or display the Website's content.

9. On information and belief, Defendant's Website is also integrated with additional third-party advertising, real-time bidding, and identity-synchronization technologies operated by entities including Outbrain Inc., Taboola, Inc., BidSwitch GmbH, and Rezync. These technologies execute automatically within users' browsers during ordinary page loads, including when the Stitch Fix homepage and category pages are accessed. In the ordinary course of their operation, these Trackers cause browser-initiated transmissions to third-party servers that include full page URLs, referrer paths, persistent or partner-assigned unique identifiers, device- and browser-level characteristics, and other routing, addressing, and signaling information. This includes cookie-synchronization requests in which Criteo-assigned identifiers are transmitted to Outbrain, real-time bidding and profiling requests transmitted to Taboola endpoints, identifier-mapping requests transmitted to BidSwitch's exchange infrastructure, and identity-sync communications with Rezync. These transmissions occur automatically and prior to any user interaction or consent, are not required to render the Website's content, and enable cross-partner retargeting, identity reconciliation, and behavioral profiling across the advertising ecosystem. Taboola is operated by a registered California data broker. Defendant deploys and enables these technologies without obtaining prior user consent and without any court authorization.

10. Through the Trackers, the Third Parties collect routing, addressing, and signaling information from users' browsers and devices without users' knowledge or consent. As documented in the Nike evidence, this information includes users' IP-based routing data; full page URLs and referrer URLs; browser and device type; operating system; screen dimensions; language settings; and unique session- and device-level identifiers assigned by third-party tracking systems, including analytics, advertising, and

demand-side platforms. The Trackers also record behavioral events associated with users' interactions with the Website, such as page views, navigation between pages, and other engagement signals transmitted contemporaneously with page loads. Using this information, the Third Parties are able to approximate geographic location from IP routing data and associate repeated visits or interactions with the same device or browser over time. Collectively, this information ("User Information") is used for analytics, behavioral measurement, advertising attribution, and targeted advertising within commercial advertising ecosystems. Defendant knowingly enables these Trackers and benefits from the unconsented-to collection and use of User Information by leveraging it to measure Website performance, attribute user activity, and support targeted marketing and advertising that monetize the Website.

11.     The third-party tracking code executed automatically as the Website loaded. When Plaintiff's browser initiated HTTP requests to retrieve Website resources, embedded third-party scripts caused the browser to generate and transmit dialing, routing, addressing, and signaling information such as destination URLs, referrer data, device and session identifiers, and related metadata to third-party servers as part of the page-loading process itself. These transmissions occurred in real time, during page initiation and rendering, and before the requested page finished loading, without any user authorization or court order.

12.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other categories of User Information, they operate as "pen registers" and/or "trap and trace devices" within the meaning of Cal. Penal Code § 638.50. These technologies silently collect routing and addressing information for commercial purposes without the user's knowledge, consent, or interaction. Courts have recognized that such conduct falls within the scope of CIPA's prohibitions. *See, e.g., Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

13.    The privacy intrusion alleged herein is heightened by the nature of the third-party entities that operate the Trackers and receive Plaintiff's and Class Members' routing, addressing, and signaling information. As alleged above, Defendant causes users' browsers to transmit IP-based routing data, persistent and session-level identifiers, full page URLs, referrer paths, device and browser characteristics, and related signaling metadata to third parties including Google LLC, Meta Platforms, Inc., Criteo S.A., and Tapad, Inc. These entities operate large-scale advertising, analytics, retargeting, and identity-resolution platforms designed to collect, correlate, and process user interaction data across websites, sessions, and devices. By enabling and deploying these Trackers, Defendant permits third parties to record, correlate, and analyze users' web-browsing activity associated with Defendant's Website through the acquisition of addressing, routing, and signaling information, without Plaintiff's consent and without any court authorization, in violation of California Penal Code § 638.51.

14.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. The Website did not display any consent banner, pop-up, cookie notice, or prior disclosure requesting authorization before installing pen-register or trap-and-trace technology. General statements in a privacy policy buried behind non-blocking hyperlinks do not constitute the express prior consent.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    **PARTIES**

16.    Plaintiff SALEHA ABDULLAH is a California citizen residing in Contra Costa County and has an intent to remain there. Plaintiff was in California when she visited the Website to view STITCHFIX offerings, which occurred during the class period including but not limited to on December 8, 2025. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

17. STITCHFIX is a Delaware corporation that owns, operates, and/or controls the Website, www.stitchfix.com, which is an online platform offering apparel and styling services to consumers.

18. STITCHFIX conducts business throughout the United States and operates a technology-driven retail and personal styling business. Its business model emphasizes data-informed consumer engagement, digital marketing, and direct-to-consumer sales and services, with a substantial focus on online user interaction, behavioral analytics, and performance measurement.

19. The Website serves as a central component of STITCHFIX's digital commerce and customer-engagement platform. The Website provides consumers with access to apparel categories, styling and personalization offerings, promotional content, and related information about STITCHFIX's services. It functions as a primary consumer-facing interface through which users browse categories, explore offerings, and engage with STITCHFIX's digital services.

20. The Website is integrated into STITCHFIX's broader digital marketing, analytics, and advertising infrastructure. As users navigate the Website, STITCHFIX employs tracking and measurement technologies to monitor page loads, navigation activity, and engagement metrics for purposes including analytics, advertising attribution, retargeting, and digital performance evaluation. These systems operate in connection with STITCHFIX's online marketing and direct-to-consumer initiatives.

### III.    JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

22. STITCHFIX is subject to personal jurisdiction in California because it purposefully directs and conducts the business activities giving rise to Plaintiff's claims

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

from California. STITCHFIX maintains its principal executive offices in San Francisco, California, where it designs, configures, and manages the digital commerce, advertising, analytics, and tracking systems deployed on the Website. Plaintiff's claims arise directly from and relate to those California-based activities, including STITCHFIX's decisions to implement and operate tracking technologies that acquire and transmit users' dialing, routing, addressing, and signaling information to third parties during website visits.

23.    Through its California headquarters, STITCHFIX carries out high-level operational and strategic activities that are integral to its digital commerce and customer-engagement business, including the design, configuration, and management of the Website and the analytics, advertising, and tracking technologies deployed on it. Plaintiff's claims arise from and relate directly to those California-based activities because the challenged tracking practices are implemented as part of STITCHFIX's California-directed online operations overseen and supported by personnel and infrastructure located within this State.

24.    STITCHFIX is also subject to specific personal jurisdiction in California because it deliberately conducts substantial portions of its digital marketing, analytics, and advertising activities through third-party partners that maintain significant operations and infrastructure in California. These partners include Google LLC and Meta Platforms, Inc., both of which are headquartered in California and operate advertising, analytics, and tracking platforms that receive and process data transmitted from the Website.

25.    Plaintiff's claims arise from and relate directly to these California-centered commercial relationships because the dialing, routing, addressing, and signaling information transmitted through the Website is received, processed, and utilized by advertising and analytics platforms that substantially operate from and aggregate information in California. By purposefully directing its online commerce and advertising activities through California-based partners and from its California headquarters,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

STITCHFIX has established sufficient minimum contacts to support the exercise of personal jurisdiction in this forum.

26.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Plaintiff resides in this District with an intent to reside indefinitely; (2) Defendant regularly transacts business in this District and is subject to personal jurisdiction here; and (3) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV.    <u>GENERAL ALLEGATIONS</u>

### 1.    *The California Invasion of Privacy Act (CIPA)*

27.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

28.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

29.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

30.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents (Cal. Penal Code § 638.50(b)).

31.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

32.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

33.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

34.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address and the subject line, capturing the incoming information.

35.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107,

at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

36.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).)

37.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (*See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).)

38.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

**2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

39.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.* what images to load, what text should appear, or what music should play.

/ / /

40.     In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

41.     A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



42.     The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

43.     The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

44.     Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers.  Nor did Defendant obtain a court order before installing or using the Trackers.

45.     An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

46.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.   IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

47.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet.

---

[1]   *See, e.g., What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

48.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

49.     In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).  They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

50.     The distinction between a public and private IP address is fundamental to the architecture of modern networks.   Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

51.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

52.    The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

53.    Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

_____

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**<u>Figure 3:</u>**

2

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

54.    A public IP address is therefore "routing, addressing, or signaling information."   A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

55.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

56.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

57.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

58.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

59.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7]    Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

60.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10]  For example,

---

[4]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9]  Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10]  *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  for a job fair in specific city, companies can send advertisements to only those in the

2  general location of the upcoming event.[11]

3      61.    "IP targeting is a highly effective digital advertising technique that allows

4  you to deliver ads to specific physical addresses based on their internet protocol (IP)

5  address. IP targeting technology works by matching physical addresses to IP addresses,

6  allowing advertisers to serve ads to specific households or businesses based on their

7  location."[12]

8      62.    "IP targeting capabilities are highly precise, with an accuracy rate of over

9  95%. This means that advertisers can deliver highly targeted ads to specific households

10 or businesses, rather than relying on more general demographics or behavioral data."[13]

11     63.    In addition to "reach[ing] their target audience with greater precision,"

12 businesses are incentivized to use a customer's public IP address because it "can be more

13 cost-effective than other forms of advertising."[14]  "By targeting specific households or

14 businesses, businesses can avoid wasting money on ads that are unlikely to be seen by

15 their target audience."[15]

16     64.    In addition, "IP address targeting can help businesses to improve their

17 overall marketing strategy."[16]  "By analyzing data on which households or businesses

18 are responding to their ads, businesses can refine their targeting strategy and improve

19 their overall marketing efforts."[17]

20

---

21 [11] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI,
https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-

22 marketing-campaigns.
[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj

23 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV
5-5maUaAgtNEALw_wcB.

24 [13] *Id.*
[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov.

25 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-
willi

26 ams-z7bhf.
[15] *Id.*

27 [16] *Id.*
[17] *Id.*

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    65.    The collection of IP addresses here is particularly invasive here:  As a report

2    from NATO found:

[a] data broker may receive information about a[]
[website] user, including his … IP address.  The user then
opens the [website] while his phone is connected to his
home Wi-Fi network.  When this happens, the data broker
can use the IP address of the home network to identify the
user's home, and append this to the unique profile it is
compiling about the user.  If the user has a computer
connected to the same network, this computer will have
the same IP address. The data broker can then use the IP
address to connect the computer to the same user, and
identify that user when their IP address makes requests on
other publisher pages within their ad network.  Now the
data broker knows that the same individual is using both
the phone and the computer, which allows it to track
behaviour across devices and target the user and their
devices with ads on different networks.[18]

66.    In other words, not only does the collection of IP addresses by the Third

Parties cause harm in and of itself, data brokers use IP addresses to identify users, append

the IP address to a unique profile containing even more information about the user,

attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class

Members across the Internet using their IP addresses, compiling vast reams of other

personal information in the process.

67.    For these reasons, under Europe's General Data Protection Regulation, IP

addresses are considered "personal data, as they can potentially be used to identify an

individual."[19]

/ / /

/ / /

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS
CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/
cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.
[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-
an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION,
https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

68.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

69.     Often times, third-party scripts are installed on websites "for advertising purposes."[21]

70.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

71.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

72.     As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser.  This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

73.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

---

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[21] *Id.*
[22] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

74.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.  Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

75.    As a result of Defendant's tracking practices and through the deployment of identity-resolution and cookie-synchronization technologies, Defendant caused Plaintiff's website visit to be deanonymized to third parties by enabling the correlation of Plaintiff's browsing activity with persistent identifiers used across the advertising ecosystem.

76.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

**3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

77.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.  These transmissions occurred silently, automatically, and without any visual indication to Plaintiff. No disclosure, banner, or mechanism alerted Plaintiff that her device would

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

serve as a communication channel to multiple unrelated advertising and identity-resolution vendors.

78.    The third-party transmissions were triggered the moment Plaintiff's browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST requests and routing those signals to multiple advertising and identity-resolution endpoints before the requested pages finished loading or became visible on her device.

79.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

80.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

81.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email

addresses, form submissions, or third-party databases, can enable the reidentification of a user.

82.     The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

83.     In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

84.     The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

85.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  new identifier is set, and the Tracker resumes collecting the user's IP address and

2  associated behavioral data.

3  **4.** **Plaintiff And Class Members' Data Has Financial Value**

4      86.      Given the number of Internet users, the "world's most valuable resource is

5  no longer oil, but data."[23]

6      87.      Consumers' web browsing histories have an economic value of more than

7  $52 per year, while their contact information is worth at least $4.20 per year, and their

8  demographic information is worth at least $3.00 per year.[24]

9      88.      There is a "a study that values users' browsing histories at $52 per year, as

10  well as research panels that pay participants for access to their browsing histories."[25]

11      89.      Extracted personal data can be used to design products, platforms, and

12  marketing techniques. A study by the McKinsey global consultancy concluded that

13  businesses that "leverage customer behavior insights outperform peers by 85 percent in

14  sales growth and more than 25 percent in gross margin."[26]

15      90.      In 2013, the Organization for Economic Cooperation and Development

16  ("OECD") estimated that data trafficking markets had begun pricing personal data,

17  including those obtained in illicit ways without personal consent. It found that illegal

18  markets in personal data valued each credit cardholder record at between 1 and 30 U.S.

19  dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data

20  brokers sell customer profiles of the sort that an online retailer might collect and maintain

21  for about 55 U.S. dollars, and that individual points of personal data ranged in price from

22

23  [23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

24  [24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

25  [25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

26  [26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017),

27  https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-

28  your-customer-data

$0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

91.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

92.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

93.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

94.    By implementing the Trackers on the Website, Defendant builds and contributes to detailed behavioral profiles of Plaintiff and other Website visitors. As alleged above, the Trackers capture and transmit category-level browsing activity, page

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

URLs, referrer paths, navigation behavior, and device- and browser-level identifiers, enabling Defendant and its advertising and identity-resolution partners to recognize repeat visits from the same browser or device. This behavioral data is ingested into third-party advertising and retargeting platforms, where it is used to associate users with inferred interests and shopping intent, to deliver retargeted advertisements to users who previously visited the Website, and to develop audience segments and "lookalike" models designed to reach other users exhibiting similar behavioral characteristics. These practices allow Defendant and its partners to systematically monetize users' browsing activity and increase the effectiveness of Defendant's digital advertising and customer-acquisition efforts.

95.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

96.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

97.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6.    *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy***

98.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

99.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

100.    During Plaintiff's visit to the Website, the Trackers deployed by Defendant captured and transmitted Plaintiff's browsing behavior, page URLs, referrer paths, persistent identifiers, and related signaling information to third-party advertising, retargeting, and identity-resolution platforms, including Google, Meta, Criteo, and associated identity-sync and exchange partners. As a result of these transmissions, Plaintiff's browsing activity was incorporated into those platforms' advertising and audience systems, enabling Defendant and its partners to recognize Plaintiff as a prior Website visitor, associate Plaintiff with inferred consumer interests, and include Plaintiff in retargeting and audience-segmentation workflows used to optimize advertising performance and customer acquisition. Defendant's deployment of these Trackers thus

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1   monetized Plaintiff's browsing activity through the actual ingestion and use of Plaintiff's

2   data within third-party advertising and identity infrastructures

3       101.    To put the invasiveness of Defendant's violations of the CIPA into

4   perspective, it is also important to understand three concepts: data brokers, real-time

5   bidding, and cookie syncing.

6       102.    In short, the import of these concepts is that: (i) the Third Parties are data

7   brokers (or partner with data brokers) that collect user information from Website visitors

8   to uniquely identify and de-anonymize users by combining their IP addresses, Device

9   Metadata, User Information, and unique user ID values with whatever information those

10  Third Parties have on a user from other sources; (ii) the Third Parties share that

11  information with other entities to create the most complete user profile they can (through

12  cookie syncing), which includes a more complete and non-anonymous portrait of the

13  user; and (iii) those profiles are offered up for sale through the real-time bidding process

14  to the benefit of Defendant and the Third Parties and to the detriment of users' privacy

15  interests.

16          **a. Data Brokers And Real-Time Bidding: The Information Economy**

17              *Data Brokers*

18      103.    While "[t]here is no single, agreed-upon definition of data brokers in United

19  States law,"[29] California law defines a "data broker" as "a business that knowingly

20  collects and sells to third parties the personal information of a consumer with whom the

21  business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain

22  exceptions.  Cal. Civ. Code § 1798.99.80(c).

23      104.    Any entity that qualifies as a "data broker" under California law must

24  specifically register as such Cal. Civ. Code § 1798.99.82(a).  Here, the Tapad Tracker

25  and the Taboola Tracker are both operated by registered data brokers.

26

27  [29] Justin Sherman, Duke Sanford Cyber Policy Program, Data Brokers and Sensitive
    Data on U.S. Individuals: Threats to American Civil Rights, National Security, and

28  Democracy, at 2 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.

105.   "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

106.   For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

107.   Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

/ / /

---

[30] SHERMAN, *supra*, at 2.

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/ 2817946.2817957.

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[33] SHERMAN, *supra*, at 1.

[34] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    108.    This data collection has grave implications for Americans' right to privacy.

2    For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S.

3    Immigration and Customs Enforcement [] purchase data from data brokers—without

4    warrants, public disclosures, or robust oversight—to carry out everything from criminal

5    investigations to deportations."[35]

6    109.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many
>
> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

23    110.    Similarly, as the report from NATO noted, corporate data brokers cause

24    numerous privacy harms, including but not limited to depriving users of the right to

25    control who does and does not acquire their personal information, unwanted

_____

[35] *Id.* at 9.

[36] *Id.*

advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

**Figure 4:**



111.   As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

---

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

[38] *Id.* at 11.

112.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

113.   These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

114.   In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

115.   As a result of Defendant's installation of trackers operated by data brokers like Tapad and Taboola, and by numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is linked to existing profiles maintained by those brokers, or used to generate new ones. This linkage occurs through the collection of IP addresses, device metadata, and other user information from the browsers of Defendant's Website visitors.

116.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by

---

[39]  Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40]  Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

117.    Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

118.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

119.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process."  "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[42]  And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

120.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like DoubleClick and Criteo help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

121.    The RTB process works as follows:

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] *Id.*

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, DoubleClick and Criteo]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

**Figure 5:**



122.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.   These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will

---

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

**Figure 6:**



123.   In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

124.   Likewise, a DSP like DoubleClick and Criteo can generate the highest and most targeted bids from advertisers with providing those advertisers with as much

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

125. All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

126. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

      a.    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

      b.    "send[ing] sensitive data across geographic borders."

      c.    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

127. Given that the Criteo and DoubleClick Trackers operates as a DSP here, the last point is particularly relevant, as it means Criteo and Google collect and disclose Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

128. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[47] Geoghegan, *supra*.

1  129.  For these reasons, some have characterized "real-time bidding" as "[t]he

2  biggest data breach ever recorded" because of the shear number of entities that receive

3  personal information[48]:

4  **Figure 7:**



17  130.  All of this is in line with protecting the right to determine who does and

18  does not get to know one's information, a harm long recognized at common law and one

19  the CIPA was enacted to protect against.  *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985)

20  (noting the CIPA was drafted with a two-party consent requirement to protect "the right

21  to control the nature and extent of the firsthand dissemination of [one's] statements");

22  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-

23  64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass

24  the individual's control of information concerning his or her person.").

26  / / /

27

28  [48]  DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/
(video).

*Cookie Syncing*

131.  It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

132.  Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

133.  Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator*

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

*advertiser.com this time, using a specifically crafted URL (step 3).*

2

…

3

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

4

5

6

7

8

9

**Figure 8:**

10

11



12

13

14

15

16

17

18

19

20

21

22

23

24

134.    Through this process, third party trackers are not only able to resolve user

25

identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2

26

27

28

---

[51] Papadopoulos, *supra*, at 1433.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1   knew as "user123" are the same person), they can "track a user to a much larger number

2   of websites," even though that "do not have any collaboration with" the third party.[52]

3       135.  On the flip side, "CSync may re-identify web users even after they delete

4   their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers

5   usually place and sync a new set of userIDs, and eventually reconstruct a new browsing

6   history."[54] But if a tracker can "respawn" its cookie or like to another persistent identifier

7   (like an IP address), "then through CSync, all of them can link the user's browsing

8   histories from before and after her state erasure.  Consequently: (i) users are not able to

9   abolish their assigned userIDs even after carefully erasing their set cookies, and (ii)

10   trackers are enabled to link user's history across state resets."[55]

11       136.  Thus, "syncing userIDs of a given user increases the user identifiability

12   while browsing, thus reducing their overall anonymity on the Web."[56]

13       137.  The tracking activity at issue does not depend on users remaining

14   anonymous. When the Trackers deployed on the Website execute within a user's

15   browser, they assign and transmit persistent identifiers and related signaling data to their

16   respective third-party operators as part of ordinary analytics, advertising, and session-

17   measurement functions. As a result, the same browser or device can be recognized across

18   multiple pageviews and visits to the Website by those third parties. This persistence

19   allows third-party platforms to associate a user's browsing activity with an identifiable

20   browser or device profile over time, thereby eliminating true anonymity during visits to

21   the Website, even in the absence of account login or user-provided identifying

22   information.

23       138.  To summarize the proceeding allegations, data brokers focus on collecting

24   as much information about Website users as possible to create comprehensive user

25

26   [52] Papadopoulos, *supra*, at 1434.

  [53] *Id*.

27   [54] *See id*.

  [55] *Id*.

28   [56] *Id.* at 1441.

profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

139. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

140. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

141. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

142. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a

coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

143.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

144.   Defendant deploys the Trackers to support behavioral profiling and targeted advertising. As reflected in the network evidence, multiple Trackers execute automatically during page load and navigation events, including Trackers implemented through tag management and others embedded directly in the Website's code. These Trackers initiate the collection and transmission of pageview data, navigation activity, referrer paths, session-level metadata, and device- and browser-level identifiers. Through these operations, user behavior is associated with cookies, persistent identifiers, and pseudonymous advertising IDs used by third-party advertising and identity platforms, enabling the recognition of repeat visits and the incorporation of user activity into advertising, retargeting, and audience-segmentation systems.

145.   The Trackers participate in programmatic advertising and audience-segmentation ecosystems by capturing behavioral signals from the Website and associating those signals with advertising audiences through the use of persistent identifiers. As reflected in the network evidence, these Trackers link users' browsing activity to third-party advertising and retargeting platforms through identifier synchronization and cookie-based recognition, allowing user activity to be incorporated into broader advertising networks and audience models. In the ordinary course of their operation, these platforms set or read cookies and related identifiers to recognize repeat

visits across sessions and domains, facilitating behavioral audience expansion and retargeting workflows used in targeted advertising.

146.    Criteo S.A. and Google LLC, through Google Ads and DoubleClick, operate advertising, measurement, and attribution technologies within the programmatic advertising ecosystem. As deployed on the Website, the Criteo and DoubleClick Trackers receive routing, addressing, and signaling information associated with users' visits, including full page URLs, referrer paths, timestamps, and platform-assigned browser or device identifiers, as part of their ordinary operation. This information enables these platforms to recognize the same browser or device across multiple pageviews and visits and to associate those interactions with Criteo- and Google-assigned advertising identifiers. Criteo and DoubleClick further engage in identifier-matching and cookie-based recognition, including cross-partner synchronization in the case of Criteo, allowing page-level browsing signals generated on the Website to be incorporated into advertising measurement, attribution, retargeting, and campaign-optimization workflows within their respective advertising systems.

## V.    SPECIFIC ALLEGATIONS

### 1.    The Google Trackers

147.    Defendant embedded Google tracking technologies on the Website, including Google Tag Manager, Google Analytics, and Google Ads/DoubleClick (collectively, the "Google Trackers"). These technologies automatically execute when a user loads the Website and cause the user's browser to transmit non-content dialing, routing, addressing, and signaling information to Google-controlled servers, including IP address, full page URL, referrer header, timestamp, and browser and device characteristics. In doing so, the Google Trackers function as pen registers and/or trap-and-trace devices or processes within the meaning of California Penal Code § 638.51.

148.    Figure 9 is a Chrome DevTools Network capture showing a GET request to https://www.googletagmanager.com/gtm.js?id=GTM-… initiated automatically upon page load and without any user interaction. The capture reflects a successful 200 OK

response and identifies the destination as Google-controlled infrastructure. The request headers include a Referer identifying the Website. This figure demonstrates that Defendant configured the Website to invoke Google Tag Manager as the entry point for Google's analytics and advertising stack.

**Figure 9:**



149.   Figure 10 is a Chrome DevTools capture of the Google Analytics request payload generated during the same page-load sequence. The payload reveals transmission of persistent Google-assigned identifiers and session data, including a unique client identifier, session identifier, full landing URL, page title, referrer information, browser language, and screen resolution. This information constitutes non-content addressing and signaling data identifying the source and context of the user's visit and is not required to render the Website.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10:**



150.   Figure 11 is a Fiddler capture showing live outbound HTTPS requests transmitted from the user's browser to Google Ads / DoubleClick infrastructure during the same visit. The capture reflects advertising-related measurement requests containing harmonized identifiers, timestamps, page URLs, and device metadata shared across Google Analytics and Google Ads systems, confirming that page-level signaling generated on the Website was transmitted off the user's device and incorporated into Google's advertising and attribution platforms.

/ / /

/ / /

/ / /

45

**Figure 11:**



151.   Figure 12 is a Wireshark capture showing DNS resolution and network routing associated with Google domains contacted during the session, including analytics.google.com, googleadservices.com, and doubleclick.net. The capture identifies Google-controlled destination hosts and corresponding IP addresses, corroborating that the outbound transmissions initiated by the Google Trackers were routed through the network to Google infrastructure. This figure completes the addressing and routing chain initiated by the Website.

/ / /

/ / /

/ / /

46

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 12:**



152. Figures 9 through 12 together document a single, coordinated tracking process operating across the browser, application, and network layers. As shown, Google Tag Manager is automatically invoked at page load, generating page-level and device-level signaling data that is transmitted off the user's device to Google Analytics and Google Ads/DoubleClick systems and routed to Google-controlled servers. Taken together, these figures establish an end-to-end process—from automatic code execution through off-device transmission and network routing—by which the Google Trackers capture and transmit non-content dialing, routing, addressing, and signaling information during ordinary use of the Website.

153. As shown collectively in Figures 9 through 12, the Google Trackers constitute at least a "process" within the meaning of California Penal Code § 638.51 because they are software mechanisms that identify users, capture dialing, routing, addressing, and signaling data, and transmit that data to a third party. They also constitute at least a "device" because their operation depends on execution within the user's computing hardware. See *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D.

47

Cal. Nov. 8, 2023).

154.   The information captured and transmitted by the Google Trackers consists of non-content dialing, routing, addressing, and signaling information, including IP address, URLs visited, referrer headers, timestamps, and browser or device identifiers associated with users' interactions with the Website. This information identifies the source, destination, and timing of users' communications with the Website.

155.   Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Google Trackers or the transmission of addressing and signaling information to Google.

156.   By embedding and enabling the Google Trackers on the Website, Defendant caused the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of California Penal Code § 638.51.

### 2.    *The Facebook Tracker*

157.   Defendant embedded the Meta Platforms, Inc. tracking technology commonly known as the Facebook Pixel (the "Facebook Tracker") on the Website. The Facebook Tracker executes automatically upon page load and causes the user's browser to transmit non-content dialing, routing, addressing, and signaling information to Meta-controlled servers, including full page URLs, referrer paths, timestamps, persistent browser identifiers, screen dimensions, device and browser characteristics, and IP-based routing information. In doing so, the Facebook Tracker operates as a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

158.   Figure 13 is a Chrome DevTools Network capture showing a Facebook Pixel tr/ request transmitting a PageView event immediately upon loading a Stitch Fix webpage. The request includes Meta's Pixel identifier, the full landing URL, referrer path, precise timestamp, screen dimensions, and a persistent Facebook browser identifier (fbp). The event fires automatically at page load, without any click, scroll, or user

interaction, demonstrating that the Facebook Tracker initiates behavioral and identity signaling as soon as the Website loads.

**Figure 13:**



159.   Figure 14 is a Chrome DevTools Request Headers capture associated with the same Facebook Pixel request. The headers reveal the transmission of detailed device- and routing-level metadata to Meta, including the full User-Agent string, Accept-Language, Referer, and cross-site fetch metadata. These attributes classify the user's browser environment, locale, and platform and function as fingerprinting vectors when combined with Meta's persistent identifiers. This information is not required to render the Website and instead serves identification and tracking purposes.

/ / /

/ / /

/ / /

49

1

**Figure 14:**



160.   Figure 15 is a Fiddler capture showing the raw Facebook Pixel payload transmitted from the user's browser to Meta infrastructure during the same page-load sequence. The capture confirms that Meta receives a complete structured record containing the Facebook browser identifier (fbp), Pixel ID, landing URL, referrer path, screen dimensions, timestamp, and page metadata. This evidence confirms that the signaling data observed in the browser is actually transmitted off the user's device to Meta in full fidelity as part of the Facebook Tracker's ordinary operation.

/ / /

/ / /

/ / /

50

**Figure 15:**



161.  Figure 16 is a Wireshark capture showing DNS resolution and network routing associated with Meta domains contacted during the session, including connect.facebook.net and Facebook-controlled CDN endpoints. The capture identifies the user's device initiating DNS queries and routing encrypted traffic to Meta-controlled IP addresses during page load, corroborating that the Facebook Tracker's signaling and identifier data is routed through the network to Meta infrastructure. This figure completes the addressing and routing chain initiated by the Website.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 16:**



162. Figures 13 through 16 together document a single, coordinated tracking process operating across the browser, application, and network layers. As shown, the Facebook Tracker executes automatically at page load, generates page-level and device-level signaling data, transmits that data off the user's device via HTTPS to Meta-controlled servers, and routes the resulting traffic to Meta infrastructure over the network. Taken together, these figures establish an end-to-end process—from automatic code execution through off-device transmission and network routing—by which the Facebook Tracker captures and transmits non-content dialing, routing, addressing, and signaling information during ordinary use of the Website.

163. As shown collectively in Figures 13 through 16, the Facebook Tracker constitutes at least a "process" within the meaning of California Penal Code § 638.51 because it is a software mechanism that identifies users, captures dialing, routing, addressing, and signaling data, and transmits that data to a third party. It also constitutes at least a "device" because its operation depends on execution within the user's computing hardware.

/ / /

52

164.    The information captured and transmitted by the Facebook Tracker consists of non-content dialing, routing, addressing, and signaling information, including IP address, URLs visited, referrer headers, timestamps, persistent browser identifiers, screen dimensions, and device or browser characteristics associated with users' interactions with the Website. This information identifies the source, destination, and timing of users' interactions with the Website.

165.    Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Facebook Tracker or for the transmission of addressing and signaling information to Meta.

166.    By embedding and enabling the Facebook Tracker on the Website, Defendant caused the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of California Penal Code § 638.51.

### 3.    The Criteo Tracker

167.    Defendant embedded tracking technologies operated by Criteo S.A. (the "Criteo Tracker") on the Website. The Criteo Tracker executes automatically upon page load and causes the user's browser to transmit non-content dialing, routing, addressing, and signaling information to Criteo-controlled servers, including page URLs, referrer paths, persistent advertising identifiers, partner-assigned identifiers, device and browser characteristics, timestamps, and IP-based routing information. In doing so, the Criteo Tracker operates as a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

168.    Figure 17 is a Chrome DevTools Network capture showing an immediate cluster of outbound requests to Criteo endpoints—including dynamic.criteo.com, sslwidget.criteo.com/event, gumi.criteo.com/sid, and widget.us.criteo.com—firing within the first moments of page load and without any user interaction. The sequence includes event-tracking calls and identity-fetching operations that initiate Criteo's identity graph and retargeting pipeline. This figure demonstrates that the Criteo Tracker

automatically activates upon page load and begins acquiring signaling and identifier data before any opportunity for user consent.

**Figure 17:**



169. Figure 18 is a Chrome DevTools capture of an outbound cookie-synchronization request between Criteo and Outbrain, transmitted automatically during the same page-load sequence. The request URL (https://sync.outbrain.com/cookie-sync?p=criteo&uid=…) shows Criteo supplying a Criteo-assigned unique identifier to Outbrain as part of a partner identity-sync operation. This exchange links the user's identifier across separate advertising companies and enables cross-site recognition and retargeting. Such identifier-sharing constitutes the acquisition and dissemination of signaling information associated with a particular user or device within the meaning of California Penal Code § 638.51.

/ / /

/ / /

54

**Figure 18:**



170.   Figure 19 is a Fiddler capture showing the raw Criteo event payload transmitted from the user's browser to Criteo infrastructure during the same visit. The decoded payload includes Criteo event identifiers, encoded device or user identifiers, structured partner identifier fields, behavioral classification parameters, and full URL and domain attributes associated with the Website. The payload further reflects ingestion of third-party identifiers, confirming that Criteo correlates identifiers originating from multiple advertising platforms as part of its ordinary tracking and retargeting operation. This evidence confirms that the signaling data observed in the browser is actually transmitted off the device in full fidelity to Criteo.

/ / /

/ / /

/ / /

55

**Figure 19:**



171.  Figure 20 is a Wireshark capture showing DNS resolution and network routing associated with Criteo domains contacted during the session, including dynamic.criteo.com, sslwidget.criteo.com, gumi.criteo.com, and widget.us.criteo.com. The capture identifies the user's device initiating DNS queries and routing encrypted traffic to Criteo-controlled IP addresses during page load, corroborating that the Criteo Tracker's signaling and identifier data is routed through the network to Criteo infrastructure. This figure completes the addressing and routing chain initiated by the Website.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 20:**



172.   Figures 17 through 20 together document a single, coordinated tracking process operating across the browser, application, and network layers. As shown, the Criteo Tracker executes automatically at page load, generates page-level and device-level signaling data, synchronizes user identifiers with third-party partners, transmits that data off the user's device to Criteo-controlled servers, and routes the resulting traffic to Criteo infrastructure over the network. Taken together, these figures establish an end-to-end process—from automatic code execution through off-device transmission, cross-partner identifier correlation, and network routing—by which the Criteo Tracker captures and transmits non-content dialing, routing, addressing, and signaling information during ordinary use of the Website.

173.   As shown collectively in Figures 17 through 20, the Criteo Tracker constitutes at least a "process" within the meaning of California Penal Code § 638.51 because it is a software mechanism that identifies users, captures dialing, routing, addressing, and signaling data, and transmits that data to third parties, including

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertising and identity partners. It also constitutes at least a "device" because its operation depends on execution within the user's computing hardware.

174.    The information captured and transmitted by the Criteo Tracker consists of non-content dialing, routing, addressing, and signaling information, including IP address, URLs visited, referrer paths, timestamps, persistent advertising identifiers, partner-assigned identifiers, and device or browser characteristics associated with users' interactions with the Website. This information identifies the source, destination, and timing of users' interactions with the Website and enables cross-site recognition and retargeting.

175.    Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Criteo Tracker or for the transmission and synchronization of addressing and signaling information to Criteo and its advertising partners.

176.    By embedding and enabling the Criteo Tracker on the Website, Defendant caused the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of California Penal Code § 638.51.

### 4.    *The Tapad Tracker*

177.    Defendant embedded tracking technology operated by Tapad, Inc. (the "Tapad Tracker") on the Website. The Tapad Tracker executes automatically upon page load and causes the user's browser to transmit non-content dialing, routing, addressing, and signaling information to Tapad-controlled servers, including partner-assigned identifiers, deterministic user or device identifiers, timestamps, and IP-based routing information. The Tapad Tracker does not provide any functional content for the Website and instead operates for purposes of identity resolution and cross-device tracking. In doing so, the Tapad Tracker operates as a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

/ / /

178.   Figure 21 is a Chrome DevTools Network capture showing an outbound request to https://tapestry.tapad.com/tapestry/1 initiated automatically within the first moments of page load and without any user interaction. The request includes Tapad query string parameters identifying a Tapad partner (ta_partner_id=2052) and transmitting a deterministic identifier (ta_partner_did=…) representing a specific user or device within Tapad's identity graph. The request is delivered through an invisible pixel endpoint (ta_format=png), confirming that the transmission occurs silently in the background as part of Tapad's identity-beaconing process.

**<u>Figure 21:</u>**



179.   Figure 22 is a Chrome DevTools capture of the expanded Tapad payload parameters associated with the same request. The payload confirms that Tapad receives both a partner-specific identifier and a deterministic user or device identifier in the same transmission, prior to any click, scroll, or other interaction with the Website. These identifiers are not necessary to render page content and instead enable Tapad to recognize, correlate, and map the user across devices and contexts as part of its cross-device identity resolution services.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 22:**



180.   Figures 21 and 22 together document a coordinated identity-resolution process in which the Tapad Tracker executes automatically at page load, generates partner-linked and user-specific signaling data, and transmits that data off the user's device to Tapad-controlled infrastructure. This process captures and transmits non-content dialing, routing, addressing, and signaling information associated with the user or device and therefore constitutes the installation and use of a pen register and/or trap-and-trace device or process within the meaning of California Penal Code § 638.51.

181.   As shown collectively in Figures 21–22, the Tapad Tracker constitutes at least a "process" within the meaning of California Penal Code § 638.51 because it is a software mechanism that captures and transmits signaling information identifying a specific user or device to a third party for identity resolution and tracking purposes. Its operation depends on execution within the user's computing hardware and functions independently of any user-initiated action.

182.   The information captured and transmitted by the Tapad Tracker consists of non-content dialing, routing, addressing, and signaling information, including

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

deterministic user or device identifiers, partner identifiers, timestamps, and IP-based routing data. This information identifies the source and destination of the transmission and enables persistent recognition and cross-device mapping of the user within Tapad's identity graph.

183.    Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Tapad Tracker or for the transmission of addressing and signaling information to Tapad.

184.    By embedding and enabling the Tapad Tracker on the Website, Defendant caused the unauthorized installation and use of a pen register and/or trap-and-trace device or process in violation of California Penal Code § 638.51.

## VI.    CLASS ALLEGATIONS

185.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

186.    **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

187.    **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

188.  **TYPICALITY:**  As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

189.  **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

190.  **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII.    <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

#### *By Plaintiff and the Class Members Against All Defendants*

191.  Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

1  192.   Plaintiff brings this claim individually and on behalf of the members of the

2  proposed Class against Defendant.

3  193.   Defendant uses a pen register device or process and/or a trap and trace

4  device or process on its Website by deploying the Trackers because the Trackers are

5  designed to capture the IP address, User Information, and other information such as the

6  phone number, email, routing, addressing and/or other signaling information of website

7  visitors.

8  194.   The Trackers recorded Plaintiff's dialing, routing, addressing, and signaling

9  information in real time, automatically transmitting this dialing, routing, addressing and

10  signaling data to multiple third-party ad-tech endpoints before the Webpage fully loaded.

11  195.   Defendant did not obtain consent from Plaintiff or any of the Class

12  Members before using pen registers or trap and trace devices to locate or identify users

13  of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory

14  penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational*

15  *Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal.

16  July 25, 2024).

17  ## VIII.   PRAYER FOR RELIEF

18  WHEREFORE, Plaintiff prays for the following:

19  1. An order certifying the Class, naming Plaintiff as Class
20  representative, and naming Plaintiff's attorneys as Class counsel;

21  2. An order declaring that Defendant's conduct violates CIPA;

22  3. An order of judgment in favor of Plaintiff and the Class against
23  Defendant on the cause of action asserted herein;

24  4. An order enjoining Defendant's conduct as alleged herein;

25  5. Disgorgement of profits resulting from unjust enrichment;

26  6. Statutory damages pursuant to CIPA;

27  7. Prejudgment interest;

28  8. Reasonable attorney's fees and costs; and

63

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

9. All other relief that would be just and proper as a matter of law or equity.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   December 29, 2025    **NATHAN & ASSOCIATES, APC**

By: */s/ Reuben D. Nathan*
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED